IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


LAVELL GREEN                                                                                PLAINTIFF

      v.                            Civil No. 4:12-cv-04037

SHERIFF JAMES SINGLETON;
JAIL ADMINISTRATOR JOHNNY
GODBOLT; SARGENT BERONICA
MAULDIN; JAILER SIMON AMES;
JAILER KATHY FINCHER; and
PIERRE SUMMERVILLE                                                                    DEFENDANTS


**MEMORANDUM OPINION**

This is a civil rights case filed by the Plaintiff, Lavell Green, pursuant to the terms of 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis*. The case is before me pursuant to the consent of the parties. ECF No. 19.

Plaintiff is currently incarcerated in the Cummins Unit of the Arkansas Department of Correction located in Grady, Arkansas. However, the events that are the subject of this case occurred when Plaintiff was incarcerated in the Hempstead County Detention Center (HCDC) located in Hope, Arkansas. Specifically, Plaintiff maintains excessive force was used against him on February 22, 2012, when he was tased and pepper sprayed.

Defendants have filed a motion for partial summary judgment. ECF Nos. 29-31. Given the differing versions of the events, Defendants concede there are genuine issues of fact as to the individual capacity claims against Defendants Ames and Fincher. ECF No. 31 at ¶ 12. Plaintiff has responded to the motion. ECF No. 36. The partial summary judgment motion is ready for decision.

### 1. Background

**A. Plaintiff's Version**

Plaintiff was housed in H-pod. According to him, he pushed the control button and asked Pierre Summerville to inform the sergeant on shift, Beronica Mauldin, that he needed to speak with her in regards to a serious situation. ECF No. 1 at pg. 5. Mauldin refused to come and speak with the Plaintiff so he asked to speak with the jail administrator, Johnny Godbolt. Summerville refused to relay his message. *Id.*

As a result, Plaintiff states that he banged on the door to get an officer to come to the pod. He then stopped and sat down at a table in the pod. ECF No. 1 at pg. 6. Kathy Fincher and Simon Ames came to H-pod. *Id.* Ames entered the pod, pointed a taser gun at the Plaintiff, and pulled the trigger shooting the prongs at the Plaintiff. *Id.* The prongs missed. *Id.* So Ames "pulled the front part of the taser off and pressed it against [Plaintiff's] body shocking [Plaintiff] to the ground. Once on the ground he continued to shock [Plaintiff] over and over in different parts of [Plaintiff's] body."

Once Plaintiff was able to stand up, Ames pepper sprayed Plaintiff while yanking on his shirt. ECF No. 1 at pg. 6. Ames and Fincher then existed the pod without giving Plaintiff a chance to decontaminate. *Id.*

Plaintiff says he banged on the door again to try to get someone to come so he could decontaminate. ECF No. 1 at pg. 6. Ames and Fincher entered the pod again. Ames pointed the taser at Plaintiff and he tried to go to his cell. *Id.* Ames discharged the taser and the prongs went into Plaintiff's left side causing him to fall to the ground. *Id.* While this was occurring, Plaintiff asserts that Ames was being sarcastic asking him if he wanted a § 1983 form now. *Id.* Ames rolled the Plaintiff over and handcuffed him. Beronica Mauldin came to the pod and took pictures of the prongs still stuck in his side. *Id.* Plaintiff states that Fincher then yanked out the probes leaving his

side swollen and bleeding. *Id.*

Ames in a "rage" began taking all of the Plaintiff's property and throwing it all over the place. ECF No. 1 at pgs. 6-7. In the process a Bible that had belonged to Plaintiff's grandmother was destroyed. *Id.* Plaintiff states that Ames was going to pepper spray him again but Mauldin stopped him. *Id.* at pg. 7.

Plaintiff asserts that he was left in the pod with his hands cuffed behind his back in pain and feeling light headed. ECF No. 1 at pg. 7. Plaintiff attempted to reach the control button but was unable to do so he went to his cell to sit down. *Id.* Before he could sit, Plaintiff states he became unconscious and landed face first on the concrete floor. *Id.*

When he regained consciousness, Plaintiff states he was face first in a small, but noticeable, pool of blood. ECF No. 1 at pg. 7. His handcuffs had been removed so he asserts that the jailers must have been aware of his state. *Id.*

Plaintiff states he was finally able to get up and pushed the intercom button asking for assistance. ECF No. 1 at pg. 7. His request was refused. *Id.* At this point, Plaintiff felt his "only resort to get help was a desperate attempt to cover the camera." *Id.* The jailers came but did not assist him. *Id.* In fact, Plaintiff alleges that the taser was pulled on him again and he was told to put his belongings in a laundry basket "or else [he] would be shot again." *Id.*

Plaintiff was moved to B-pod and placed in a cell with no running water. ECF No. 1 at pg. 7. Plaintiff asserts that he still had pepper spray on his clothes, face, and head. *Id.* He was locked down and the trap on his door shut. *Id.* Plaintiff says he was barely able to breathe. *Id.* He states he had no drinking water and the toilet did not flush. *Id.* He asserts that a review of the surveillance video would verify his claims. *Id.* He maintains he was not decontaminated and received no medical attention. *Id.*

In an addendum (ECF No. 6 at pg. 1), Plaintiff indicated he was suing the Defendants in their official capacities. When asked to describe in detail the custom, policy, or practice, Plaintiff responded: "They will come and tase or pepper spray you without so much as seeing what the problem is or given a direct order." *Id.* at pg. 2.

**B. Defendants' Version**

Defendants' version of the events is set forth in an incident report and supplement prepared by Ames and Fincher. Ames' report states as follows:

> On February 22, 2012 at approximately 1200 hours, control operator, Officer Pierre Summerville radioed and advised that inmate Lavell Green was kicking and banging on the door in h-pod where he was housed. I, Officer Ames, had previously advised inmate Green to stop banging the door and being disorderly. I further advised the subject that failure to do so would result in disciplinary action being taken. I specifically advised him that failure to comply to these orders would result in him being sprayed and or tasered. Despite several warnings, inmate Green chose not to comply to orders and violently beat the H-pod door. I, Officer Ames, accompanied by Officer Fincher went to H-pod to address the situation. I entered H-pod and attempted to taser the subject but the prongs did not make contact. The subject took on an aggressive posture with fists clenched and then removed his shirt in a gesture that suggested to me that he was ready and willing to attack. I then pulled my can of pepper spray out and sprayed the subject. Sgt. Mauldin arrived in H-pod after a moment and the subject was given an opportunity to take a shower. After only a brief moment away from H-pod, the subject began to beat the door again. After several minutes of listening to him beat and bang on the door, I reentered H-pod and tasered the subject. The prongs made contact in his upper and lower side of his torso. After the taser cycle ended, the subject lay on the floor making verbal threats on my life. He (Green), refused to let me remove the prongs from his body, so Sgt. Mauldin and Officer Fincher removed the prongs from the subject. Later in the day, I was ordered to remove Mr. Green from H-pod and place him in B-pod. Before leaving B-pod, inmate Green made more threats on my life and a shooting gesture with his index finger, middle finger, and thumb all the while vowing to get revenge on me in the streets. There is nothing further to report at this time.

*Defendants' Exhibit* (hereinafter *Defts' Ex.*) A at pgs. 1-2.

Fincher's report states as follows:

> At approximately 1200 hours, Officer Ames and I responded to a loud beating of the

> doors in H-pod. Inmate Lavell Green had been told several times to stop beating the door. As we opened the door, Officer Ames tried to taser the subject but missed him. Inmate green began hollering and acting as if he wanted to fight Officer Ames and I. Officer Ames then pepper sprayed the subject. Sgt. Mauldin came to H-pod and inmate Lavell Green was given the chance to take a shower. We left H-pod and a few minutes later he began beating the door again. Officer Ames and I returned to H-pod and the subject was tasered. The prongs hit him in the upper and lower region of his side. He shouted several threats to Officer Ames. He did not want Ames to remove the prongs from him so Sgt. Mauldin and I removed the prongs. We later were ordered to move Green from H-pod to B-pod. There is nothing further to report at this time.

*Defts' Ex.* A at pg. 3.

Plaintiff submitted a grievance about the event. *Defts' Ex.* B at pg. 2. Captain Godbolt investigated and determined the "incident was handled properly and the force used was justifiable." *Id.* at pg. 1.

### C. Applicable HCDC Policies

The use of force policy of the HCDC provides that "[o]nly that amount of physical force necessary to maintain or regain control of an inmate shall be used." *Defts' Ex.* C at pg. 1, I(A). It sets forth a continuum of the use of force: verbal persuasion; warning of the consequences of non-cooperation; a show of force by calling for backup; and then attempts to use physical holds designed to gain control of the inmate. *Id.* at pg. 1, II(C). If all this fails, the officer may retreat and obtain chemical irritant spray. *Id.* at pg. 2, II(E).

The policy on the use of a chemical weapon (Oleoresin Capsicum) provides that it may be used "anytime an officer feels that its use will reduce the likelihood of injury to either the officer or the inmate." *Defts' Ex.* C at pg. 3, II(B). With respect to the use of force continuum use of the spray falls "between 'verbal commands' and actual 'hands on' use of force when resistance is encountered." *Id.* at pg. 3, II(C). The policy then provides the basic outline for use of force: (a)

physical presence; verbal warning; verbal command; chemical weapon; hands-on control; impact weapon; deadly force. *Id.* at pg. 3, II(C)(1). "Inmates subdued through the use of OC shall be taken to a wash-up area prior to any further processing." *Id.* at pg. 4, II(C)(2)(e).

The taser policy indicates it is a use of force option which should be used only when "the circumstances create reasonable belief that it may be necessary to use it." *Defts' Ex.* C at pg. 5. The policy goes on to indicate that there are three types of reportable taser uses: (1) a spark display, a non-contact demonstration of the tasers ability to discharge electricity; (2) a drive stun, contact made by pressing the front of the taser into the body and activating the taser causing "significant localized pain in the area touched by the taser but no significant effect on the central nervous system;" and (3) use of the probes, firing of the cartridge with probes making direct contact resulting in a temporary immobilization or central nervous system disruption. *Id.* at pgs. 5-6. "The TASER® may be used when a subject is displaying active, aggressive or agitated aggressive resistance to a Deputy attempting to conduct legal law enforcement activities." *Id.* at pg. 6.

With respect to the drive stun, the policy provides that "[u]se of the 'Drive Stun' is discouraged except in situations where the 'probe' deployment is not possible and the immediate application of the 'Drive Stun' will bring the subject displaying active, aggressive or aggravated aggressive resistance safely under control. Multiple 'Drive Stuns' are discouraged and must be justified." *Defts' Ex.* C at pg. 7.

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants have moved for the dismissal of all official capacity claims and all claims against Separate Defendants Singleton, Godbolt, Mauldin, and Summerville.

"Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of his constitutional rights, we analyze [his] claim against [Defendants] under the Fourteenth Amendment, rather than the Eighth Amendment." *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010)(citations omitted).

> The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. Because the Due Process Clause prohibits *any* punishment of a pretrial, be that punishment cruel-and-unusual or not, we ask whether the defendant's purpose in using force was to injure, punish or discipline the detainee.

*Jackson v. Buckman*, 756 F.3d 1060, 1067 (8th Cir. 2014)(internal quotation marks and citations

omitted).

The Due Process inquiry uses the objective reasonableness inquiry of the Fourth Amendment. *Id*. The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Andrews v. Neer*, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001). The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Id.*

Here, Defendants concede that there are genuine issues of material fact as to the individual capacity claims against Ames and Fincher. However, with respect to the remaining Defendants, they argue that all claims against them should be dismissed. Sheriff Singleton, Godbolt, and Summerville were not involved in the incident in anyway. Mauldin was present only after the use of force. In fact, Plaintiff states that Mauldin prevented Ames from using pepper spray against him another time. ECF No. 1 at pg. 6.

Liability under § 1983 requires some personal or direct involvement in the alleged unconstitutional action. *See e.g., Ripson v. Alles*, 21 F.3d 805, 808-09 (8th Cir. 1994). The named Defendants were not present during the incident; were not consulted about the incident; and, other than Godbolt, were not personally involved in responding to Plaintiff's grievance. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). General responsibility for supervising the jail is insufficient to establish personal involvement. *Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011). In short, there is simply no basis on which

Sheriff Singleton, Sergeant Godbolt, Sergeant Mauldin, or Officer Summerville could be held liable.

Similarly, Godbolt was unaware of the use of force until he responded to the Plaintiff's grievance. If anything, Godbolt was negligent in performing an investigation into the use of force. Negligence, however, cannot form the basis of a § 1983 claim. *See e.g., Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 499 (8th Cir. 2008), "[A] bare allegation that someone in supervisory authority has been [negligent], without any specification of that person's contact in fact with the plaintiff, [or] even an explicit charge of inadequate training or supervision of subordinates, is [not] sufficient to state a [§ 1983] claim." *Id.*; *see also Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against Hempstead County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Hempstead County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not

> be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

*Id*. at 817-18.

In his addendum, Plaintiff asserted that Hempstead County had a policy or custom of tasing and pepper spraying inmates without determining if the inmate had a problem and without giving the inmate direct orders. ECF No. 6 at ¶ 2. In his summary judgment response, Plaintiff does not mention the existence of any policy or custom of Hempstead County.

To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whiteledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Plaintiff has failed to do so.

In *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825 (8th Cir. 2013), the Court outlined the necessary elements for establishing the existence of an unconstitutional custom. It stated:

> To establish a claim for "custom" liability, [Plaintiff] must demonstrate:
>
> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That Plaintiff was injured by acts pursuant to the governmental entity's custom,

*i.e.*, that the custom was the moving force behind the constitutional violation. *Id.*, 725 F.3d at 828 (citations omitted).

Here, Plaintiff has shown nothing except an alleged unconstitutional use of force on February 22, 2012. He does not contend the HCDC's policies and customs were themselves unconstitutional. A single deviation is insufficient to establish the a custom. *Id.* at 829. Multiple incidents occurring over a course of time are needed to establish a custom. *Id.* Plaintiff's allegations in this case do not suggest the existence of any unconstitutional policy or custom of Hempstead County.

### 4. Conclusion

For the reasons stated, the Defendants' motion for partial summary judgment (ECF Nos. 29-31) will be granted by a separate order entered this same day. All claims against Sheriff Singleton, Jail Administrator Godbolt, Sergeant Mauldin, and Officer Summerville will be dismissed.

**DATED** this 3rd day of September 2014.

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE